IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MARY CATHERINE GRASMICK,

    Defendant.

## PLEA AGREEMENT

The United States Attorney's Office for the District of Colorado (the "Office"), by and through, Bryan David Fields, Assistant United States Attorney for the District of Colorado, and the defendant, Mary Catherine Grasmick (the "Defendant"), personally and by counsel, Paul E. Pelletier and Hilary S. Cairnie, submit the following Plea Agreement, pursuant to D.C.COLO.LCrR 11.1.

### I.    OBLIGATIONS OF THE PARTIES

#### A.    Defendant's Obligations

1. The Defendant agrees to waive indictment and plead guilty to an Information charging her with falsification of records with the intent to obstruct a federal investigation, a violation of Title 18, United States Code, Section 1519.

#### B.    The Office's Obligations

2. In exchange for the Defendant's plea of guilty to the count charged in the Information, the Office agrees not to file any additional criminal charges in the District of

1


Court's Exhibit 1

Colorado against the Defendant and/or Company A based on information known to the Office, as outlined in the statement of facts set forth in paragraphs 10-29 below.

3. In addition, provided the Defendant does nothing inconsistent with accepting responsibility between the date this agreement is signed and the date of sentencing, the government will recommend that the Defendant receive a two-level reduction for acceptance of responsibility, pursuant to Section 3E1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). Should the Court determine that the applicable offense level under the Guidelines is 16 or higher, the government agrees to request that the Defendant receive an additional one-level reduction pursuant to Section 3E1.1(b) of the United States Sentencing Guidelines.

### C. Defendant's Waiver of Appeal

4. The Defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding this, and in exchange for the concessions made by the Office in this agreement, the Defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence unless it meets one of the following criteria: (1) the sentence exceeds the maximum penalty provided for in the statute for conviction; (2) the sentence exceeds the advisory guideline range that applies to a total offense level of 14, or (3) the Office appeals the sentence imposed. If any of these three criteria apply, the Defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

5. The Defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence in any collateral attack (including, but not limited to, a motion

brought under 28 U.S.C. § 2255). This waiver provision does not prevent the Defendant from seeking relief otherwise available in a collateral attack on any of the following grounds: (1) the Defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute; (2) the Defendant was deprived of the effective assistance of counsel; or (3) the Defendant was prejudiced by prosecutorial misconduct.

## II.     ELEMENTS OF THE OFFENSE

6.     The parties agree that the elements of the offense to which this plea is being tendered are as follows:

> *First,* that the defendant knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in any record, document or tangible object;
>
> *Second,* that the defendant did so with the intent to impede, obstruct, or influence the investigation or proper administration of any matter, or in contemplation of or relation to any matter;
>
> *Third,* that the matter was within the jurisdiction of a department or agency of the United States.

*United State v. Yielding,* 657 F.3d 688, 710-15 (8th Cir. 2011).

## III.    STATUTORY PENALTIES

7.     The maximum statutory penalty for violating 18 U.S.C. § 1519 is not more than 20 years' imprisonment; a fine of $250,000 or two times the gross gain or loss, whichever is greater (or both a fine and imprisonment); not more than 3 years of supervised release; and a $100 special assessment. If probation or supervised release is imposed, the Court may order restitution as a condition of probation or supervised release. The Office agrees that it will not seek an order of restitution as it is not warranted in this matter. A violation of supervised release or probation may result in a separate prison sentence and additional supervision.

3

## IV. COLLATERAL CONSEQUENCES

8. The conviction may further cause the loss of certain civil rights, including, but not limited to, the right to possess a firearm, vote, hold elected office, and sit on a jury.

## V. STIPULATION OF FACTS

9. The parties agree that there is a factual basis for the guilty plea that the Defendant will tender pursuant to this plea agreement. That factual basis, at all times relevant to this agreement, is set forth below in paragraphs 10-29. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. This stipulation of facts does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have stipulated and which are relevant to the Court's guideline computations, to other 18 U.S.C. § 3553 factors, or the Court's overall sentencing decision.

### A. Background: The SBA's HUBZone Program

10. The Historically Underutilized Business Zone program ("HUBZone") was a federal program established to provide federal contracting assistance in the form of competitive advantages to qualified small business concerns located in historically underutilized business zones in an effort to increase employment opportunities, investment, and economic development in those areas.

11. The HUBZone program was administered by the United States Small Business Administration, a Department and Agency of the United States. ("SBA"), under a framework of

rules promulgated by the SBA specifically for the HUBZone Program. 13 CFR 126 (the "HUBZone Rules"). From time to time, the SBA has changed, amended and supplemented the HUBZone Rules.

12. Participants in the HUBZone program benefitted in two ways. First, only HUBZone participants were eligible to bid on federal contracts specifically "set aside" for HUBZone program contractors – no other entities large or small could compete for those contracts. Second, HUBZone-certified companies were eligible for a 10% price evaluation preference in connection with certain procurements that were subject to full and open competition.

13. Under the HUBZone Rules, in order to qualify for the SBA certification into the HUBZone program a business concern was required to establish, among other things, that (a) it was a small business, (b) it was controlled and owned at least 51 percent by United States citizens, (c) it maintained a principal office located within an area that had been designated as a HUBZone, and (d) at least 35% of its employees resided within a designated HUBZone and (e) while performing any contract awarded on the basis of its HUBZone status, the entity "will attempt to maintain (see § 126.103) " having 35% of its employees reside in a HUBZone. At the time that the entity applies for a HUBZone certification from the SBA or for renewal certification, it must meet or exceed the minimum employee residency requirement. At the time that a HUBZone certified entity bids on a contract opportunity, it must meet or exceed the minimum employee residency requirement. At the time that a HUBZone certified entity receives a contract award, it must meet or exceed the minimum employee residency requirement. At all other times the HUBZone Rules permit the certified entity to fall below the minimum (35%)

employee residency requirement, so long as it is "attempting" to maintain the minimum employee residency requirement. Only small business concerns that satisfied all of the program qualification requirements could be certified by the SBA for participation in in the HUBZone Program and could thereafter compete for HUBZone set-aside contracts or receive the HUBZone evaluation preference in non-set-aside procurements. In order to receive a HUBZone certification from the SBA, the contractor had to submit a formal application requesting inclusion in the Program. As part of the application process, an authorized officer of the concern was required to represent to the SBA, among other things, that the concern met each of the requirements of the HUBZone program, that all of the statements and information contained in the application form, and in attachments to the application, were complete and accurate as of the date of submission, and while its application was being considered by the SBA, that the concern would immediately notify the SBA of any material change which could affect the applicant's eligibility for the HUBZone program.

14. In order to remain in the HUBZone Program, a previously certified HUBZone entity was required to apply for recertification by the SBA every three years. As part of the recertification process, the small business concern was required to once again submit a renewal application, signed by an authorized officer, representing therein that the entity met the requirements of the HUBZone program, that the statements in the certification were complete and accurate as of the date of submission, and that while its renewal application was pending, the concern would immediately notify the SBA of any material change which could affect the concern's eligibility for the HUBZone program.

15. HUBZone-certified small business concerns were required to retain documentation demonstrating satisfaction of the HUBZone program's requirements for six years from the date of the submission of their application and any recertifications. Under the HUBZone Rules, the SBA reserved the right to conduct program examinations of HUBZone applicants in order to verify the accuracy of information provided to the SBA by a small business concern. Among the things a HUBZone examiner could review were employment records containing information about an employee's residency, as well as property tax, public utility, postal records, and other documents relating to employee residency. Under the HUBZone Rules, the SBA is entitled to ask a HUBZone-certified small business concern to submit additional information as part of the examination process.

**B.  Background: Relevant Entities and Persons**

16. Company A was a limited liability company in the business of providing general contracting services and organized under the laws of Colorado. Its principal office was at 920 West 10th Street in Pueblo, Colorado. In 2003, Company A first applied for and was certified by the SBA as a HUBZone entity under the HUBZone Rules in effect at that time. In 2006, Company A submitted its re-certification application and the SBA thereafter issued its re-certification, again, under the HUBZone Rules in effect in 2006. In 2009, Company A submitted its re-certification application which prompted the SBA to conduct a closer review of Company A's application materials. Between 2003 and June 2012 Company A was on the List of Qualified HUBZone Small Business Concerns maintained by the SBA. In June 2012, the SBA removed Company A from the List of Qualified HUBZone Small Business Concerns for failing to meet the minimum employee residency requirement.

17. The Defendant was a resident of Pueblo, Colorado. She was the majority owner of Company A and its Operating Manager.

18. The Colorado Army National Guard ("COANG") was part of the National Guard Bureau, which was part of the United States Department of Defense ("DOD"), which was a Department and Agency of the United States. Funding for COANG projects was administered by the United States Property and Fiscal Officer.

19. The Department of Defense Office of Inspector General ("DOD-OIG") and the Defense Criminal Investigative Service ("DCIS") were part of the United States Department of Defense, which was a Department and Agency of the United States.

### C.     The COANG-RTI Contract

20. The Defendant submitted and caused to be submitted on March 14, 2011, an Online Representations and Certifications Application ("ORCA") in which she certified as the Operating Manager of Company A (i) that Company A was a HUBZone small business concern on the SBA's list of qualified HUBZone small business concerns, and (ii) that no material changes in Company A's HUBZone employee percentage had occurred since it was certified.

21. On or about June 14, 2011 COANG issued solicitation W912LC-11-R-0008 for a new Regional Training Institute ("RTI").

22. The Defendant submitted and caused to be submitted in the name of Company A a proposal for the COANG RTI program on July 21, 2011. In that proposal, the Defendant stated that Company A was a HUBZone small business concern, and requested the application of the HUBZone 10% price evaluation preference. The Defendant certified as part of the

proposal that, as of July 21, 2011, the representations made in Company A's March 14, 2011 ORCA were still current, accurate and complete.

23. Company A was awarded the COANG RTI contract, W912LC-11-C-0008, on September 15, 2011. The Defendant executed the COANG RTI contract that same day.

### D. The SBA's Examination of Company A, the DCIS Investigation, and the Defendant's Falsification of Records

24. The Defendant knew that Company A had falsely represented itself as a HUBZone small business when it bid on the COANG-RTI on July 21, 2011 and when it was awarded that contract on September 15, 2011. The Defendant knew that in July and September 2011, J.J.K. did not reside in a HUBZone and, instead, resided in an apartment complex outside of a HUBZone. As a result, the defendant knew that Company A did not meet the requirement that 35% of its employees reside in a HUBZone and, as a result, also knew that Company A did not actually qualify for the benefits of the HUBZone program.

25. On or about June 22, 2016, DCIS Special Agent Albert Weisner sent an email to the Defendant requesting information related to Company A's employees as of July 21, 2011 and September 15, 2011 and their HUBZone status, as well as their respective personnel and payroll records. The email was sent in contemplation of a future matter relating to whether Company A had made false statements in connection with the COANG-RTI contract.

26. The Defendant responded to Special Agent Weisner's request by causing to be sent on June 29, 2016, a package containing two spreadsheets, respectively identifying Company A employees as of July 21, 2011 and September 15, 2011 (the Spreadsheets). The Spreadsheets were created to show that at least 35% of Company A's employees resided in HUBZones on July 15 and September 21, 2011. That representation was false: less than the required minimum of

thirty-five percent of Company A's employees resided in a HUBZone on either July 15 or September 21, 2011. Accordingly, Company A had not actually qualified for the 10% price evaluation preference when the government evaluated bids for the COANG-RTI project.

27. The Spreadsheets also contained specific false entries wherein J.J.K. was included among the other employees of Company A that resided in a HUBZone, except that J.J.K. did not actually reside in a HUBZone. The Defendant knew that J.J.K. did not reside in a HUBZone on July 21 or September 15, 2011, but by reporting J.J.K. as a HUBZone employee, Company A would be able to claim that it satisfied the minimum employee residency requirement of 35% (in reality, however, J.J.K. should not have been included among HUBZone employees and Company A fell short of satisfying the 35% requirement).

28. Although the Defendant knew that certain information in the spreadsheets was false and that the spreadsheets contained false entries, she intentionally submitted them to DCIS Special Agent Wiesner to influence the DCIS investigation by making it appear as though Company A had been in compliance with the HUBZone program when it submitted its offer for, and later received, the COANG-RTI Contract. Because the Defendant knew that she had caused to be made false representations to the Colorado Army National Guard, she also intended to obstruct any effort by the DCIS to investigate those representations or to investigate the true nature of Company A's HUBZone status in 2011. The Defendant intended to influence and impede the DCIS investigation relating to, among other things, whether Company A had misrepresented itself as a HUBZone small business concern in order to obtain the COANG-RTI contract.

29.  Matters relating to whether Defendant made on behalf of Company A false and fraudulent representations to the SBA and to the DOD during the course of the COANG-RTI procurement were within the jurisdiction of the SBA, the DOD, and the Department of Justice, each of which was an agency or a department of the United States.

## VI.  ADVISORY GUIDELINE COMPUTATION AND §3553 ADVISEMENT

30.  The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

  a.  Pursuant to U.S.S.G. § 2J1.2, the base offense level is 14.

  b.  Pursuant to U.S.S.G. § 3E1.1(a), the Defendant should receive a two-level decrease in the offense level for pleading guilty and accepting responsibility. The Defendant has accepted responsibility for the offense, will waive indictment, and will plead guilty to the charge in the Information. The resulting offense level is 12.

  c.  The parties understand any computation of the Defendant's criminal history category is tentative and that the Defendant is in a better position to know the relevant facts than is the government. The criminal history category will be more completely and accurately determined by the Probation Department and the additional facts regarding criminal history can

greatly affect the final guideline range. Nevertheless, based on information known to the parties at this time, the parties believe that the Defendant has no criminal history and falls into Criminal History Category I.

        d.      Accordingly, with a (tentative) Criminal History Category of I, and an estimated offense level of 12, the advisory guideline range is 10-16 months' imprisonment. In order to be as accurate as possible, with the criminal history category undetermined at this time, however, the estimated offense level could conceivably result in a range of imprisonment from 10 months (bottom of Category I at level 12) to 37 months (top of Category VI at level 12). Such a sentence would fall within Zone C of the Sentencing Guidelines.

        e.      Pursuant to U.S.S.G. § 5E.12, assuming an estimated offense level of 12, the fine range for this offense is $5,500 - $55,000, plus applicable interest and penalties.

        f.      Pursuant to U.S.S.G. § 5D1.2(a)(2), if the Court imposes a term of supervised release, that term shall be at least one but not more than three years.

        g.      The parties understand that, pursuant to 18 U.S.C. §§ 3563(b) and 3583(d) the Court may impose restitution as a condition of probation or supervised release in an amount to be determined by the Court.

31.      The parties understand that although the Court will consider the parties' estimate, the Court must make its own determination of the guideline range. In doing so, the Court is not bound by the position of any party.

32.      No estimate by the parties regarding the guideline range precludes either party from asking the Court, within the overall context of the Guidelines, to depart from that range at sentencing if that party believes that a departure is specifically authorized by the Guidelines or that

there is an aggravating or mitigating factor of kind or degree not adequately taken into consideration by the United States Sentencing Commission in formulating the advisory guidelines. Similarly, no estimate by the parties regarding the Guidelines range precludes either party from asking the Court to vary entirely from the advisory Guidelines and to impose a non-Guidelines sentence based on other factors set forth in 18 U.S.C. § 3553.

## VII. ENTIRE AGREEMENT

33. This document states the parties' entire agreement. There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied. In entering this agreement, neither the Office nor the Defendant has relied, or is relying, on any terms, promises, conditions, or assurances not expressly stated in this agreement.

Date: 9/5/19

MARY CATHERINE GRASMICK
Defendant

Date: 9.5.19

Paul Pelletier
Counsel for Defendant

Date: 9/5/19

Bryan David Fields
Assistant United States Attorney